Filed 9/24/20

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| IAN MURRAY et al.,<br><br>     Cross-complainants and Appellants,<br><br>     v.<br><br>MY TRAN et al.,<br><br>     Cross-defendants and Respondents. | D076104<br><br><br>(Super. Ct. No. 37-2017-00042515-CU-BC-CTL) |


APPEAL from an order of the Superior Court of San Diego County, Randa E. Trapp, Judge.  Affirmed in part and reversed in part.

Watkins Firm, Daniel Watkins and Skye Resendes for Cross-complainants and Appellants.

CGS3 LLP, Gregory S. Markow, Sean M. Gaffney and Jamie Altman Buggy for Cross-defendants and Respondents.


Dr. My Tran and Dr. Ian Murray are dentists who owned a dental practice known as Bird Rock Dental.  Dr. Murray worked at the practice and Dr. Tran handled the business operations through his own separate entity.  About two years after they formed the practice, they had financial disputes.  In the midst of these disputes, Dr. Tran accused Dr. Murray of substandard

dental work and published his claims to several individuals and groups, mainly to people working for Dr. Tran, but also to Dr. Murray's new employer and to one retired dentist.

Both parties sued the other, and the lawsuits were consolidated. Dr. Murray's second amended complaint asserted 22 causes of action, two of which are at issue in this appeal: defamation per se and defamation.

Dr. Tran and related entities moved to dismiss the two defamation causes of action under the anti-SLAPP statute. (Code Civ. Proc, § 425.16.)[1] The court found the defamation claims were governed by this statute, and Dr. Murray did not meet his burden to show a probability of prevailing. The court thus struck the two causes of action from the complaint. Dr. Murray (and related entities) appeal.

We reverse in part and affirm in part. We conclude Dr. Murray alleged five separate defamation claims for purposes of anti-SLAPP analysis, and Dr. Tran met his burden to show only one of those claims alleged speech protected under the anti-SLAPP statute: the alleged defamatory statements to Dr. Murray's new employer. As to that claim, Dr. Murray did not meet his burden to show a probability of prevailing because he did not present evidence that Dr. Tran in fact made these statements.

In reaching these conclusions, we analyze and apply the California Supreme Court's recently announced two-part test for evaluating whether allegations trigger coverage under section 425.16, subdivision (e)(4) when the statements concern the public interest but were not made in a public forum. (*FilmOn.com v. DoubleVerify, Inc.* (2019) 7 Cal.5th 133 (*FilmOn.com*).) *FilmOn.com* directs courts applying section 425.16, subdivision (e)(4) to evaluate whether the alleged wrongful statements contributed to a public

---

[1]     All further statutory references are to the Code of Civil Procedure.

discussion or conversation on the issue, and in conducting this inquiry to evaluate the specific context in which the statements were made. Under this test, we determine the alleged statements in four of the five asserted categories of defamatory statements were not made in connection with a public conversation or discussion of the issues and thus were not protected by the anti-SLAPP statute.

On remand, the court shall vacate its order granting the anti-SLAPP motion, and issue a new order denying the motion on all defamatory claims except for the claims contained in Paragraphs 319 and 335 of Dr. Murray's second amended complaint.[2]

## FACTUAL SUMMARY

We summarize the relevant facts in the light most favorable to Dr. Murray, the party opposing the anti-SLAPP motion. (See *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067 (*Park*).) Our factual recitation is necessarily detailed because of the required contextual analysis and the extensive factual record.

### *Background*

In early 2015, Dr. Tran and Dr. Murray formed the Tran Murray Dental Corporation (TMDC) to purchase an existing dental practice in Bird Rock. Dr. Tran and Dr. Murray were TMDC's only shareholders and

---

[2] Although the defamation causes of action were asserted only by Dr. Murray, Dr. Murray included his related entities (named in other portions of the lawsuit) in opposing the anti-SLAPP motion and as parties to the appeal. Our references to Dr. Murray include these related entities unless the context indicates otherwise. Similarly, our references to Dr. Tran include his related entities unless the context indicates otherwise. The distinctions between each party and his related entities is not material for purposes of this appeal. We note also that although the second amended complaint at issue is actually a cross-complaint, it is labeled a complaint and we thus refer to it as such.

directors, and each owned 50 percent. Dr. Murray was responsible for practicing dentistry for TMDC, and Dr. Tran was responsible for managing TMDC's business affairs from Las Vegas, where he lives. Dr. Tran did so through his wholly owned companies, Streamline Dental Solutions, LLC and Streamline Dental Solutions, CA, LLC (collectively Streamline). Dr. Tran (through these entities) also owned or operated other dental practices outside the San Diego area.

In Spring 2017, Dr. Tran and Dr. Murray had disputes over financial issues pertaining to TMDC. The disputes were triggered when a former TMDC dental assistant sued Streamline and Dr. Murray for wage and hour violations. After this lawsuit was settled, Dr. Murray and Dr. Tran had conflicts about funding the settlement and the attorney fees.

At about this same time, the parties and their joint attorney Jason Wood were discussing a plan for Dr. Murray to make an asset purchase of the dental practice from Dr. Tran. During these discussions, Dr. Murray began questioning certain financial practices by Dr. Tran.

In July, Dr. Murray told Dr. Tran he wanted to buy his interest in TMDC, instead of agreeing to Dr. Tran's asset purchase plan. In the first two weeks of August, the parties continued to disagree about business matters, such as the timing of Dr. Murray's buyout and Dr. Tran's purported failure to deposit funds to cover the costs of the employee lawsuit. Dr. Tran then ordered Streamline to withhold Murray's monthly pay and also claimed (through attorney Wood) that Murray had been overcompensated in the amount of $164,944.22 primarily because laboratory fees had not been deducted from his pay. Dr. Murray responded that he had never agreed to this deduction.

4

On August 12, Dr. Murray wrote to Dr. Tran questioning payments made to him of about $38,000, and asserting the parties had not agreed to allow Dr. Tran to use his capital investment to meet his deposit obligations.

Two days later, Dr. Tran responded to Dr. Murray with a lengthy letter that began: "At this stage, you've pushed our relationship into a nosedive." Dr. Tran then detailed his view of the parties' financial disputes, and asserted that if Dr. Murray did not make "significant progress with your financing, we will provide you notice with our intention of buying you out."

Four days later, on Friday afternoon August 18, at 4:38 p.m., Dr. Murray sent an email to Dr. Tran with a notice that he was exercising his rights under the parties' shareholder agreement to "expel" Dr. Tran from TMDC. In the notice, he claimed Dr. Tran had violated the agreement and accused him of multiple breaches of his fiduciary duties including self-dealing, unlawfully withholding Dr. Murray's pay, overcharging TMDC, and other forms of financial malfeasance. Dr. Murray asserted that under the parties' agreement, they needed to value the business and then TMDC would buy Dr. Tran's shares for 75 percent of their value.

At about 7 p.m. that evening, Dr. Murray wrote another email noting that "Based on our recent contact, you have read the Notice of Expulsion." Dr. Murray discussed the parties' financial disagreements; reiterated his interest in purchasing the business; and asserted that Dr. Tran (through Streamline) was responsible for the former employee's lawsuit.

### Dr. Tran's Alleged Defamatory Statements

About three hours after Dr. Murray's last email, at 10:25 p.m., Dr. Tran for the first time expressed his view that Dr. Murray had provided improper care to a patient. He did this by sending Dr. Murray an email stating: "This is notice for you to rectify your work regarding your crown work . . . which

5

you delivered 6/08/2016 for patient chart [number]. This resulted in a re-cementation of the crown . . . one year after delivery. You can see the open margin . . . . Please rectify the situation by contacting the patient and redoing the work before catastrophic damage occur[s] . . . . If you fail to do so, we will have to explore alternatives for our patients at Bird[ ]Rock."

A few minutes later, Dr. Tran sent another email to Dr. Murray, stating: "This is the second patient this week that we have identified to have poor quality work completed with open margins . . . . It is quite alarming to us based upon this trend. Please rectify this situation immediately." He included a photograph of a tooth X-ray.

Very early the next morning, at 5:25 a.m. and 5:37 a.m., Dr. Tran sent emails to Dr. Murray repeating the information from the prior evening regarding the claimed poor quality work on the two patients, and also sent the emails to several other individuals. The subject line on the emails was "Below Standard of Care work—Notice to Rectify." The names on the cc line included joint-attorney Woods; several individuals associated with Dr. Tran's own dental businesses (Arvin Tounian, Lisa Hoang, Adrien Overholtzer, Silvia Carpenter); the TMDC regional manager (Kim Newman); and the "Admin Team" at Streamline. Except for attorney Woods, the domain name on each of these email addresses was "@sdentals.com," the same domain name used by Dr. Tran. Based on information in the record, Arvin Tounian is a dentist and Hoang, Overholtzer, and Carpenter are employees; all are associated with Streamline (Dr. Tran's own separate entity).

Dr. Murray responded by stating he would recall one of the patients, and the other patient had already been informed but wanted to "wait to rectify," and new crowns had been ordered. Dr. Murray also noted that Dr.

6

Tran had "deactivated" his access to patient charts so it was "hard to verify and analyze" Dr. Tran's concerns.

About one week later, on three separate days (August 23, 25, and 26), Dr. Tran wrote emails to Dr. Murray, identifying another patient chart and claiming at length that Dr. Murray was performing substandard dental work and requesting that Dr. Murray "respond with proper timing so that the team at Bird Rock can contact the patients immediately." These emails were copied to most of the individuals listed above (each with the @sdentals.com as the domain name), and Dr. Murray's attorneys.

During this same week, Dr. Tran wrote to Dr. Murray, stating in part: "If you want to walk down an expensive legal battle, I hope you have deep enough pockets for it. This is not a win for anyone and especially for you considering your young career."

The next month, Dr. Murray filed a federal lawsuit on behalf of TMDC against Dr. Tran.

At about this same time, on September 22, Dr. Tran sent an email to Dr. Phil Devore, a Las Vegas dentist, who had agreed to review Dr. Murray's patient charts. Although a copy of this email is not contained in the record, Dr. Murray alleges that in this email, Dr. Tran identified five concerns he had with Dr. Murray's work; said Dr. Murray has "refused to acknowledge or respond to the mounting complaints"; and said Dr. Devore's report would "help us . . . regain the standard of care at our practice." This email also included Dr. Tran's earlier email to Dr. Murray, claiming his work "does not meet the standard of care," and "that working multiple columns has not provided you with the ability to perform quality dentistry and this has harmed your growth as a dentist and the patients you have treated." Dr. Murray alleged this September 22 email was copied to attorney Wood; "the

7

Admin Team at . . . Streamline"; Amy Tongsiri (a Las Vegas dentist who formerly provided dental services for Streamline); and several individuals associated with Streamline (dentist Tounian, and employees Overholtzer and Hoang).

Five days later, on September 27, Dr. Devore responded to Dr. Tran, stating that after reviewing nine of Dr. Murray's patient charts, he found "[i]n every single case there were numerous examples of treatment that was rendered beneath the standard of care." After explaining these conclusions, Dr. Devore said, "[Dr. Murray's] diagnostic and clinical skills are demonstrably substandard" and "recommend[ed]" that Dr. Tran "separate [him]self from this doctor based on the poor quality of care that he is delivering . . . ."

That same day, Dr. Tran wrote to Dr. Murray saying: "Ian, I'm available to talk tonight. Things do not have to go down this ugly route. This is our last opportunity to discuss things prior to me walking down a path that's irreversible. I'm a good person and it's a tough decision, I know that if I have to deal with the clinical issues, it's going to be life changing for you."

Two days later, on September 29, Dr. Tran emailed Dr. Devore's letter (opining on Dr. Murray's substandard work) to Dr. Phil Burgess and his wife. Dr. Burgess, a retired dentist, sold the Bird Rock Dental practice to TMDC almost three years earlier; had worked with Dr. Murray in the practice before retiring; and had known Dr. Murray since he was a young boy. Dr. Tran's cover email to Dr. Burgess stated in part:

> "Ever since you left [the Bird Rock practice], I believe the quality of work from Dr. Murray has dropped significantly. I've enlisted the help of independent auditors to finally come to my conclusion. [¶ . . . ¶] We have urged Dr. Murray to address these concerns but he has refused to acknowledge or respond to the mounting complaints. Your

8

advice on the matter would greatly help me with insight on how to regain the standard of care at our practice. You can read the email thread of the interactions I faced below regarding crown deliveries and other clinical matters. . . . [¶] I had no choice to notify the suspension of work with Dr. Murray. I'm afraid if things go further, the California Dental Board will have to get involved."

Within two months, Dr. Tran hired Dr. Devore to work at one of his Las Vegas dental practices. Shortly before that time, Dr. Devore left his position at the University of Nevada, Las Vegas, after being accused of improperly reusing certain implant-related devices.

### *Cross-Lawsuits*

On November 8, 2017, each party filed a lawsuit against the other.[3] Dr. Tran (on behalf of himself and TMDC) sued Dr. Murray and TMDC seeking dissolution of the business, and alleging breach of contract and breach of various fiduciary duties. Dr. Murray (on behalf of himself, his professional corporation, and TMDC) sued Dr. Tran, Streamline, and TMDC, alleging various employment-related claims, business torts, fraud, theft, breach of contract, and breach of fiduciary duty.

More than one year later, in February 2019, Dr. Murray filed a second amended complaint, adding two defamation causes of action (defamation and defamation per se). Both causes of action alleged the same five categories of alleged defamatory statements by Dr. Tran.

**First**, Dr. Murray alleged Dr. Tran made false statements about the quality of his dental work in the August 19 through August 26 emails. As noted, some or all of the emails were copied to attorney Wood, several other individuals, and the Streamline "Admin Team." Each email address

---

[3]     Several days earlier, Dr. Murray had dismissed his federal lawsuit.

9

contained the same domain name (@sdentals.com) used by Dr. Tran (except for attorney Wood's email).

**Second**, Dr. Murray alleged Dr. Tran made false statements in the September 22 email to Dr. Devore in which he claimed Dr. Murray's work was substandard and requested that Dr. Devore evaluate Dr. Murray's work. Dr. Tran allegedly also sent this email to the individuals/groups identified in the category above; and to Amy Tongsiri, a Las Vegas dentist who formerly provided dental services for Streamline.

**Third**, Dr. Murray alleged Dr. Tran made false statements in the September 29 email to Dr. Burgess and his wife.

**Fourth**, Dr. Murray alleged that in December 2017, Dr. Tran spoke with dentist Dr. Roger Tran (no relation), the owner of a San Diego dental practice at which Dr. Murray was working after leaving Bird Rock Dental. As detailed below, Dr. Tran allegedly told Dr. Roger Tran that "Dr. Murray is doing substandard care in La Jolla" and that he was providing this information to "protect his patients and [Dr. Roger Tran's] patients from Dr. Murray's (alleged) substandard care."

**Fifth,** Dr. Murray alleged that on October 1, 2017, Dr. Tran "held a meeting with staff personnel at TMDC such that [Dr.] Tran . . . appeared by video or phone conference with staff personnel at TMDC, including doctors, the location manager, hygienists, dentists and others, during which [Dr.] Tran [falsely] stated to these individuals that [Dr.] Murray . . . engaged in substandard medical care of his patients . . . ."

Dr. Murray alleged that in asserting each of these false representations about his work, Dr. Tran's "goal was not to improve the standard of care at TMDC but instead to blackmail and defame [him]."

### Anti-SLAPP Motion

Several weeks later Dr. Tran moved to strike the defamation claims (21st and 22nd causes of action).

Dr. Tran argued his statements about Dr. Murray's work performance reflect his protected speech on "an issue of public interest" under section 425.16, subdivision (e)(4). He asserted that a dentist who performs deficient services "poses a serious health risk to members of the San Diego community" and the topic concerns "a substantial number of people." He relied on *Wong v. Jing* (2010) 189 Cal.App.4th 1354 (*Wong*), which held that a statement on Yelp (a social media platform) criticizing a dentist's work and discussing her use of mercury in dental treatment was entitled to protection under section 425.16, subdivision (e)(3), pertaining to statements made in a "public forum" about an issue of public interest. (*Wong,* at pp. 1366-1367.)

Dr. Tran also argued that Dr. Murray would be unable to meet his burden on the second ("merits") step of the anti-SLAPP analysis because (1) his statements were privileged under the common interest doctrine; (2) Dr. Murray would be unable to show he acted with malice; (3) Dr. Murray would be unable to show the falsity of his statements because there is no evidence controverting Dr. Devore's expert opinion that Dr. Murray's work was "beneath the standard of care"; and (4) his statements were nonactionable opinions.

In support of these arguments, Dr. Tran submitted his declaration stating he and other (unnamed) dentists at Streamline and TMDC "became concerned" with the quality of Dr. Murray's work after reviewing patient files. He said he retained Dr. Devore after Dr. Murray refused to submit "to a peer review panel and allow that panel to determine if malpractice had occurred."

He attached Dr. Devore's September 27 letter describing his review of the nine patient charts and discussing his opinion that Dr. Murray was performing below the standard of care. Dr. Tran acknowledged he retained Dr. Devore to work as a dentist at one of his dental practices two months after he provided this opinion, but indicated this hiring decision was unrelated to Dr. Devore's work on this matter.

Dr. Tran also submitted Dr. Devore's declaration in which he reiterated his opinions that Dr. Murray's work reflected in the nine patient files did not meet the standard of care for dentists.

### Opposition to Anti-SLAPP Motion

In opposing the anti-SLAPP motion, Dr. Murray first argued Dr. Tran's defamatory statements were not subject to the anti-SLAPP statute. He contended the statements were not made in connection with a public issue because they concerned a private matter involving solely the parties, and, unlike the *Wong* case, were not made in a public forum. Dr. Murray emphasized there was no evidence the statements had been communicated to any patients or potential patients or that any patients had complained or had any concerns with his dental services.

Second, Dr. Murray argued that even if the anti-SLAPP statute governed his claims, he had a probability of prevailing because Dr. Tran's statements are not protected by the common interest privilege as they were not made to fellow dentists with an interest in TMDC's dental practice and, even if they were, the common interest privilege does not apply because the statements were made with malice. He further argued the assertions that he performed substandard work were false and statements of fact, not opinion.

In support, Dr. Murray produced the correspondence between himself and Dr. Tran reflecting their communications about their business disputes,

and Dr. Tran's emails first accusing him of substandard work shortly after Dr. Murray's August 18 expulsion email. He also presented evidence of some (but not all) of the alleged defamatory statements.

Dr. Murray also submitted declarations from a certified periodontist and five Bird Rock Dental employees, each stating they were unaware of any patient complaints about him. He additionally proffered declarations and letters from several oral surgeons and endodontists who have worked with him and his patients, and who opined that Dr. Murray is an "excellent" dentist and has always provided competent care to patients, including in crown delivery.

Dr. Murray also submitted the declaration of Dr. Ian Aires, who said he has "practiced dentistry for over 35 years as a specialist Prosthodontist," a specialty that "places heavy emphasis on restorations (crowns)." He said he has "intimate knowledge of the standard of care for restorations (crowns) which is at issue in this lawsuit." Dr. Aires then stated:

> "I am certain that if this case was reviewed by the Peer Review Society they would find Dr. Murray's treatment to be well within the standard of care [for crowns]. . . . [¶] I have reviewed 24 patient files of patients treated by Dr. Murray in the period 2014-2018. I have reviewed the 9 patients that Dr. Devore opined on that were treated by Dr. Murray. I have also reviewed all the documents related to the case including statements by many dentists with whom Dr. Murray shared patients."

Dr. Aires also discussed various criticisms of Dr. Devore's conclusions, and said another dentist had examined four of the nine patients whose files were reviewed by Dr. Devore, and this other dentist "found no reason to re-do any treatment of Dr. Murray" and that Dr. Murray "appears previously to have redone two restorations in two of these patients of his own accord." He noted there were "no complaints listed from the remaining 3 patients whose

13

treatment was criticized by Dr. Devore." Dr. Aires said that redoing restorations is "not an uncommon occurrence in dental practice and is not below the standard of care."

Dr. Murray also submitted a letter written by Dr. Burgess (the retired dentist), who stated: "I have known [Dr. Murray] for approximately thirty years. During that time he has grown from an inquisitive boy into a conscientious and talented dentist. He has always been concerned with doing things right and with the details. [¶] Before retiring from my dental practice, I had the honor of working with Dr. Murray. During that time, I found his work and his knowledge to be not only above average but exceptional. Not one of our patients ever complained about the quality of his work. [¶] I will continue to have trust in Dr. Murray. I will continue to refer prospective patients to him."

Dr. Murray also proffered his own declaration stating that none of his patients have "made any claims of substandard care against me," and that "Tran's accusations against me . . . arose only after I tried to expel [Dr.] Tran from TMDC because I felt he was stealing money from TMDC after the [employment] case. . . ." Dr. Murray said Dr. Tran was not responsible for conducting performance reviews at TMDC, and had never before done so. Dr. Murray also denied Dr. Tran's claim that he refused to participate in the San Diego County Dental Society's peer review process, explaining this process applies only when there is a dispute between a patient and his or her dentist.

Dr. Murray also produced a copy of a newspaper article discussing a claim that Dr. Devore had improperly reused devices used in implant procedures, contrary to manufacturer recommendations, and that the "inquiry into the reuse hampered his ability to practice fully at" the University of Nevada at Las Vegas dental school, and he left for private

14

practice at Image Dental in Las Vegas in December 2017 (a practice owned or operated by Dr. Tran).

He also submitted the deposition testimony of the regional manger for TMDC, who testified Dr. Tran told her, "he has very deep pockets and if he had to bankrupt Dr. Murray to win this, that he would."

Dr. Murray alternatively requested the court continue the motion "to permit specific discovery," and submitted his counsel's declaration explaining this request. (See § 425.16, subd. (g).)

### *Reply*

In reply, Dr. Tran asserted numerous evidentiary objections to the declarations of Dr. Aires and Dr. Murray. The objections to Dr. Aires's declaration were based mainly on lack of foundation and hearsay (regarding examinations of Dr. Murray's patients by other dentists) and relevance (regarding his opinions about why Dr. Tran made false statements about the quality of Dr. Murray's work).

### *Court's Ruling*

After a hearing, the court granted Dr. Tran's anti-SLAPP motion and dismissed the defamation causes of action. The court found the alleged defamatory statements about the quality of Dr. Murray's dental care were subject to the anti-SLAPP statute because they concerned an issue of public interest, citing section 425.16, subdivision (e)(3) and two Court of Appeal decisions, *Wong*, *supra*, 189 Cal.App.4th 1354 and *Hailstone v. Martinez* (2008) 169 Cal.App.4th 728. The court then found Dr. Murray did not meet his burden to show a probability of prevailing because he "submitted insufficient evidence to show that the accusations of substandard care made by Dr. Tran are false."

The court did not rule on Dr. Tran's evidentiary objections, nor did it expressly rule on Dr. Murray's request for a continuance to engage in additional discovery.

**DISCUSSION**

California's anti-SLAPP statute "provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*); § 425.16.) "Resolution of an anti-SLAPP motion involves two steps. First, the defendant must establish that the challenged claim arises from activity protected by [the statute]. [Citation.] If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success." (*Baral*, at p. 384.)

We apply a de novo review to a court's rulings on whether the parties met their respective burdens. (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788.)

## I. *Prong One: Protected Activity*
### A. *Overview*

Under the first step of the anti-SLAPP analysis, the moving party must show the relief sought is based on allegations arising from protected activity. (*Baral, supra,* 1 Cal.5th at p. 396; accord *Park, supra,* 2 Cal.5th at pp. 1061, 1062-1063.) In considering whether the moving party has met this burden, we start with the pleadings and also consider the evidentiary submissions. (See *Navellier v. Sletten* (2002) 29 Cal.4th 82, 89; *Bel Air Internet, LLC v. Morales* (2018) 20 Cal.App.5th 924, 935-937.)

The statute defines four categories of protected activities. (§ 425.16, subd. (e).) The first two pertain to statements made before or in connection with a legislative, executive, judicial, or other official proceeding. (§ 425.16,

16

subd. (e)(1), (2).)  The latter two pertain to statements or other actions involving a public issue or an issue of public interest:  "(3) any written or oral statement or writing *made in a place open to the public or a public forum* in connection with an issue of public interest, or (4) *any other conduct* in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  (§ 425.16, subd. (e)(3), (4), italics added.)

In the proceedings below, Dr. Tran maintained, and the court agreed, that Dr. Murray's defamation claims fell under section 425.16, *subdivision (e)(4)*, relying on a case interpreting section 425.16, *subdivision (e)(3)* in the context of allegations of substandard dental work, *Wong, supra,* 189 Cal.App.4th 1354.

In his initial appellate briefing, Dr. Murray argued *Wong* does not apply because the statements critical of the dentist in *Wong* were made on Yelp (a public forum) to a large audience of potential dental patients, whereas here the defamatory statements were made to a few parties mainly associated with Dr. Tran's private businesses.  In his respondent's brief, Dr. Tran countered that this distinction is legally irrelevant and that *Wong* governs the case because "the relevant standard [applicable to subdivision (e)(4)] does not consider whether the statements were made to the public at large—only whether the statements were made 'in connection with . . . an issue of public interest. . . .' "

However, before the parties had filed their appellate briefs, the California Supreme Court clarified the scope of the section 425.16, subdivision (e)(4) standard, and held—contrary to Dr. Tran's contention— that a court must consider the context of the alleged wrongful activities in determining the subsection's applicability, including the size and nature of

17

the audience. (*FilmOn.com, supra,* 7 Cal.5th 133.) Because neither party discussed (or even cited) *FilmOn.com* or a more recent Court of Appeal decision applying *FilmOn.com* in a healthcare context (*Yang v. Tenet Healthcare, Inc.* (2020) 48 Cal.App.5th 939 (*Yang*)), we provided the parties the opportunity to address these decisions in supplemental briefs.

After considering *FilmOn.com, Yang,* and the parties' briefing and supplemental briefing, we conclude one of the five categories of defamatory statements alleged in the complaint is governed by the anti-SLAPP statute, and the remainder do not constitute protected activity. In so concluding, we note that under *Baral*, we are required to consider each category of Dr. Tran's alleged defamatory statements as a separate "claim" subject to a motion to strike. (See *Baral, supra,* 1 Cal.5th at pp. 381-382, 384-396.)[4]

## B. *Current Case Law Pertaining to Section 425.16, subdivision (e)(4)*

In *FilmOn.com*, the plaintiff (a media entertainment entity) alleged the defendant (a business providing authentication services to customers considering advertising on the plaintiff's website) falsely characterized the plaintiff's website as containing copyright infringement and adult content, and sued for trade libel and slander. (*FilmOn.com*, *supra*, 7 Cal.5th at pp. 141-142.) The defendant moved to strike the claims, arguing adult

---

[4]    The *Baral* court held that in determining the object of an anti-SLAPP motion, the "targeted claim must amount to a 'cause of action' in the sense that it is alleged to justify a remedy," and "[n]either the form of the complaint nor the primary right at stake is determinative" of what constitutes a claim. (*Baral, supra,* 1 Cal.5th at p. 395.) Under these principles, courts have held allegations of defamatory statements arising in discrete circumstances are each separately subject to a motion to strike under section 425.16. (*Medical Marijuana, Inc. v. ProjectCBD.com* (2020) 46 Cal.App.5th 869, 886, fn. 11; see *Baral,* at pp. 392-393; *Shively v. Bozanich* (2003) 31 Cal.4th 1230, 1242 [each separate defamatory statement can give rise to a new cause of action].)

content and copyright infringement are public interest issues under section 425, subdivision (e)(4). (*FilmOn.com*, at p. 142.)

The high court agreed these are matters of public interest, but concluded that to show anti-SLAPP's applicability under section 425.16, subdivision (e)(4), " 'it is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner *itself contribute to the public debate.*' " (*FilmOn.com*, *supra*, 7 Cal.5th at pp. 150, 154, italics added.) The court said, " '[c]ontribut[ing] to the public debate' " means the defendant "participated in, or furthered, the [public] discourse that ma[de] [the] issue one of public interest." (*Id.* at pp. 150-151.)

The court reasoned that section 425.16's express purpose is to further the "continued participation in matters of public significance" (§ 425.16, subd. (a)), and the other statutory subsections (subdivision (e)(1)-(3)) contain specific elements or "contextual references" limiting their reach to this category of speech, i.e., *speech made in connection with a public discussion of an issue.* (*FilmOn.com*, *supra*, 7 Cal.5th at pp. 143-144, 149-152; see § 425.16, subd. (e)(1), (2) [speech must concern a matter at issue in a governmental or official proceeding]; § 425.16, subd. (e)(3) [statement must be made in a "public forum"].)

The court then focused on the "any other conduct" phrase in section 426.16, subdivision (e)(4) to conclude that the Legislature must have intended that this subdivision similarly apply only to statements that contribute to a public discussion on an issue. (*FilmOn.com*, *supra*, 7 Cal.5th at pp. 144-145.) The court found this requirement particularly important when applying section 425.16, subdivision (e)(4) because this subdivision can encompass a private discussion between private individuals. (*FilmOn.com*, at pp. 144-146.) Thus, to ensure the statute applies only to *constitutionally*

19

*protected* expression, *FilmOn.com* directed courts to carefully examine private statements asserted under section 425.16, subdivision (e)(4) to ensure they are sufficiently connected to an existing public discussion or debate. (*FilmOn.com,* at p. 145 ["courts should engage in a relatively careful analysis of whether a particular statement falls within the ambit of 'other conduct' encompassed by subdivision (e)(4)"].)

To assist courts in applying this analysis, the *FilmOn.com* court established a two-part inquiry to determine whether a defendant has met its burden to show its alleged wrongful activities fell within section 425.16, subdivision (e)(4)'s public interest requirement: "First, we ask what 'public issue or [ ] issue of public interest' the speech in question implicates—a question we answer by looking to the content of the speech. [Citation.] Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest." (*FilmOn.com, supra,* 7 Cal.5th at pp. 149-150.)

On the second inquiry, the court stated that a statement falls within subdivision (e)(4) if it "contributes to—that is, 'participat[es]' in or furthers— *some public conversation on the issue.*" (*FilmOn.com*, *supra*, 7 Cal.5th at p. 151.) And the court made clear that this analysis must include a consideration of the *context* or specific circumstances in which the statement was made, "including the identity of the speaker, the audience, and the purpose of the speech." (*Id.* at pp. 140, 151-152.)

In applying this test, the *FilmOn.com* court held the defendant had not met its burden to show its alleged wrongful conduct sufficiently contributed to the debate on a public issue to warrant protection under section 425.16, subdivision (e)(4). (*FilmOn.com*, *supra*, 7 Cal.5th at pp. 152-154.) The court said the defendant issued its reports with the alleged false information "not

20

to the wider public—who may well be interested" in the subject matter—"but privately, to a coterie of paying clients," who use the information for "business purposes alone." (*Id.* at p. 153.) Thus because the alleged wrongful statements about matters of public interest "never entered the public sphere, and the parties never intended it to," the defendant's reports were "too remotely connected to the public conversation about those issues, to merit protection under [section 425.16, subdivision (e)(4)'s] catchall provision." (*Id.* at p. 140).

Three months later, the high court decided *Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871 (*Wilson*), in which the court addressed primarily the issue whether employment claims alleging discrimination and retaliation can reflect protected activity under section 425.16. (*Wilson,* at pp. 881, 885-898.) But the court also considered the issue whether the anti-SLAPP statute applied to the employee's defamation claims, which alleged that the employer (CNN) falsely told the employee's supervisor and the employee's prospective future employers that the employee had committed plagiarism. (*Id.* at p. 899.) The court concluded the anti-SLAPP statute did not apply to these statements because they were about one particular instance of plagiarism and not the bigger issue of honesty in the media. (*Id.* at p. 903.) But the court also found it important that the statements were not made as part of a public discussion of the issue. The court stated: "Relevant, too, is the private context of the alleged statements. Granted, private communications may qualify as protected activity in some circumstances. [Citations.] But the private context eliminates any possibility of protection under section 425.16, subdivision (e)(3) . . . and here makes heavier [the defendant's] burden of showing that, notwithstanding the private context, the alleged statements *nevertheless contributed to discussion*

21

*or resolution of a public issue for purposes of subdivision (e)(4)."* (*Ibid.,* italics added.)

More recently (after the parties completed their initial appellate briefing), a Court of Appeal applied *FilmOn.com* in a case involving a surgeon alleging defamation against other healthcare professionals. (*Yang, supra,* 48 Cal.App.5th 939.) The surgeon sued medical entities, their staff members, and individual doctors, for making false statements about her qualifications, competence, and medical ethics. (*Id.* at p. 943.) The surgeon alleged these defendants told " 'health care providers,' 'medical practices,' *her 'patients,' and 'members of the general public'* " that the surgeon had " 'rendered care below applicable standards of practice,' that '[h]er behavior and medical ethics were below applicable standards,' that she was not 'qualified or competent to practice her specialties,' that she is 'dangerous to [her] patients and to employees and members' of the hospital's medical staff, and that she was " ' "under investigation." ' " (*Ibid.,* italics added.)

Applying *FilmOn.com*'s two-part inquiry, the Court of Appeal held the defendants met their burden to show the alleged defamatory statements fell within section 425.16, subdivision (e)(4). (*Yang, supra,* 48 Cal.App.5th at pp. 946-949.) On the first inquiry, the court stated the content of the alleged defamatory statements "implicated . . . the qualifications, competence, and professional ethics of a licensed physician" and therefore concerned a public issue. (*Id.* at p. 947.)

On the second ("functional relationship") inquiry, the *Yang* court stated the surgeon "alleges . . . the defamatory statements *were communicated to the public, not just to discrete doctors or hospital staff members*." (*Yang, supra,* 48 Cal.App.5th at p. 948, italics added.) The court found "[t]his context . . . significant, because speech *to the public* about a doctor's qualifications

22

furthers the public discourse on that matter." (*Ibid.,* italics added.) The court also said, "the hospital's directive that doctors should no longer refer patients to [the plaintiff] is similar to a statement made by a third party to aid and protect consumers, the latter of which has consistently been held to constitute protected activity under the anti-SLAPP statute." (*Id.* at pp. 948; see, e.g., *Chaker v. Mateo* (2012) 209 Cal.App.4th 1138, 1146; *Carver v. Bonds* (2005) 135 Cal.App.4th 328, 343-344; *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 900.) *Chaker, Carver,* and *Wilbanks* each involved statements critical of the defendant that were made on forums widely available to the public, including a newspaper (*Carver*), social networking site (*Chaker*), and the defendant's website (*Wilbanks*).

## C. *Analysis*

Guided by the language of section 425.16, subdivision (e)(4) and the recent decisions interpreting it (*FilmOn.com, Wilson,* and *Yang*), we evaluate whether the court properly found Dr. Tran met his burden to show the allegations arose from protected activity. In so doing, we apply *FilmOn.com*'s two-part inquiry to each of the five categories of alleged defamatory statements. (See *Baral, supra,* 1 Cal.5th at pp. 392-396.)

### 1. FilmOn.com's *First Inquiry*

Dr. Tran satisfied *FilmOn.com's* first inquiry on all five categories of alleged defamatory statements. In each category, the statements concerned Dr. Murray's qualifications and competence to perform his dental services. These are matters about which the public, including current and future dental patients, have a vital interest. (*Yang, supra,* 48 Cal.App.5th at p. 947; see *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 201 [professional conduct of California licensed physicians are " 'matters of public significance' "]; *Healthsmart Pacific, Inc. v. Kabateck* (2016) 7

23

Cal.App.5th 416, 429 [consumers "have an interest in being informed of issues concerning particular doctors and health care facilities"].)

## 2. FilmOn.com's *Second Inquiry*

*FilmOn.com*'s second inquiry requires that we determine whether the challenged statements "in some manner . . . contribute[d] to the public debate" or "public conversation" on the issue. (*FilmOn.com*, *supra*, 7 Cal.5th at pp. 150, 154.) We must consider the particular context of the speech, including the speaker's identity; the "purpose" of the speech; the nature of the audience and the intended audience; and the "timing" and "location" of the communication. (*FilmOn.com*, at pp. 140, 143-144, 154.) Because these circumstances were not the same in each category of alleged defamatory statements, we examine each category separately to determine whether Dr. Tran met his anti-SLAPP burden. We rely on the entire record in analyzing whether Dr. Tran met this burden on any one category.

### 2.a. *First Category of Alleged Defamatory Statements*

In the first category, Dr. Murray alleged that Dr. Tran sent a series of emails from August 19, 2017 through August 26, 2017 in which Dr. Tran falsely stated or implied that Dr. Murray's "standard of work was below par."

Dr. Tran sent these emails to the parties' joint business attorney (Wood); the "Admin Team" at his own business entity Streamline; and various individuals. Although the parties do not identify precisely each individual's employment or relationship with Dr. Tran, based on information in the record it appears each of these individuals were associated with Dr. Tran's businesses. Specifically, (1) dentists Tongsiri and Tounian worked for, or previously worked for, Dr. Tran's dental entities outside the San Diego area; (2) Newman was TMDC's administrative regional manager; and (3) Overholtzer, Carpenter, and Hoang are employees of Streamline or a similar

Las Vegas-based entity. Dr. Tran sent the emails to these individuals and the "Admin Team" using an email address that had the same domain name as Dr. Tran's email address (except for the emails to attorney Wood and to Dr. Tongsiri, whose email address is not identified in the record).

These alleged defamatory emails do not meet *FilmOn.com*'s functional relationship test. Although the emails contain statements about an issue of public interest (the quality of dental care at Bird Rock Dental), there is no showing the statements furthered or contributed to a public conversation or discussion on this issue. There was no allegation or evidence that any member of the public received these emails or that Dr. Tran intended that any other person read the emails. The emails were sent only to a limited number of persons within Dr. Tran's business entities, and Dr. Tran did not produce any evidence showing any of these individuals had any responsibility for, or authority over, Dr. Tran's work at TMDC. There was also no evidence that Dr. Tran intended or expected that any of the recipients would communicate to patients or other members of the public that Dr. Murray was an unqualified or incompetent dentist.

These circumstances are distinguishable from *Yang*, in which the court found the defamatory statements "further[ed] the public discourse on" the issue of the surgeon's qualifications *because* they were allegedly "communicated *to the public, not just to discrete doctors or hospital staff.*" (*Yang, supra,* 48 Cal.App.5th at p. 948, italics added.) Additionally, unlike in *Yang* where the statements were made for the stated purpose of warning potential patients that they should not use the surgeon's services, Dr. Tran

25

presented no evidence showing he sent these emails to warn patients or other users of Dr. Murray's services, or that he intended others to do so.[5]

On this record, this category of alleged defamatory statements more closely resembles the defendant's reports at issue in *FilmOn.com*—which were not distributed to the "wider public" and were only sent "privately, to a coterie of paying clients" (7 Cal.5th at p. 153)—and the defendant's statements in *Wilson* about the employee's plagiarism—which were made only within the business organization and to prospective employers (7 Cal.5th at p. 899). As in *FilmOn.com* and *Wilson,* Dr. Tran's emails were not part of a public discussion on the identified public issue.

In reaching this conclusion, we recognize that an internal discussion about the quality of dental care at a particular facility could conceivably benefit patients and thus serve the public interest. But this fact is not enough to satisfy *FilmOn.com*'s functional-relationship test. As the California Supreme Court noted in *Wilson,* " 'What a court scrutinizing the nature of speech in the anti-SLAPP context must focus on is the speech at hand, rather than the prospects that such speech may conceivably have indirect consequences for an issue of public concern.' " (*Wilson, supra,* 7 Cal.5th at p. 903.)

In his supplemental brief, Dr. Tran says that Dr. Murray alleged in his complaint that Dr. Tran "informed *the California Dental Board about Murray's substandard dental treatment.*" (Italics added.) However, this

---

5        During oral argument, Dr. Tran's counsel suggested that *Yang* held a statement in the nature of consumer protection is sufficient to trigger section 425.16, subdivision (e)(4) coverage, regardless whether the statement was actually communicated to the public. We do not read *Yang* this broadly. And to the extent *Yang's* discussion could be construed in this way, we decline to adopt the interpretation because it is contrary to *FilmOn.com*'s holding.

26

allegation is not contained in the complaint, nor was there any evidence produced that Dr. Tran made this statement to the Dental Board or to any other regulatory agency.[6]

## 2.b. *Second Category of Alleged Defamatory Statements*

In the second category, Dr. Murray alleged that Dr. Tran sent an email on September 22, 2017 to Dr. Devore (with copies to dentists Tongsiri and Tounian; the Streamline "Admin Team"; and administrative employees Newman, Overholtzer and Hoang). We reach the same conclusion on this category as the first category. Although the content of the email pertains to the important public issue of the quality of patient care, there is no showing the email contributed to a public conversation or discussion on the issue. The email reflected solely an internal discussion between Dr. Tran and his consultant, with copies to his current employees/contractors within his own business entities and one Las Vegas dentist who formerly worked for him. There was no evidence that any patient or anyone who had any responsibility for Dr. Murray's dental services at Bird Rock Dental received or otherwise read these emails, or that patients or prospective patients were the intended target for these emails.

## 2.c. *Third Category of Alleged Defamatory Statements*

The third category of alleged defamatory statements were contained in the September 2017 email from Dr. Tran to Dr. Burgess. Dr. Burgess was the dentist who sold the Bird Rock Dental practice to Dr. Tran and Dr. Murray in about 2015, and with whom Dr. Murray worked for a period of time.

---

6    In support of this contention, Dr. Tran cites to Paragraph 335 of Dr. Murray's amended complaint. This paragraph concerned only the telephone conversation between Dr. Tran and Dr. Roger Tran, and does not contain allegations that Dr. Tran communicated these claims to a regulatory board.

27

In this email, Dr. Tran notified Dr. Burgess of his concern that Dr. Murray was providing substandard dental care and had "refused to acknowledge or respond to the mounting complaints." Dr. Tran asked for Dr. Burgess's advice on "how to regain the standard of care at our practice." Dr. Tran also said, "I'm afraid if things go further, the California Dental Board will have to get involved." Dr. Tran also attached other emails in which Dr. Tran accused Dr. Murray of working below the standard of care, and included Dr. Devore's letter opining about Dr. Murray's substandard care.

In response to the anti-SLAPP motion, Dr. Murray submitted a letter from Dr. Burgess, stating that before he retired, he worked with Dr. Murray in his dental practice, and "found his work and his knowledge to be not only above average but exceptional . . . . I will continue to have trust in Dr. Murray. I will continue to refer prospective patients to him."

Dr. Tran did not include any additional information in his declaration about the purpose or intent of his communication with Dr. Burgess.

On this record, Dr. Tran did not meet his burden to show his email to Dr. Burgess was constitutionally protected under section 425.16, subdivision (e)(4). A statement to a single retired medical professional asking for assistance in remedying claimed issues in a medical practice has only an attenuated and indirect relationship to a public discussion or communication on this issue.

In reaching this conclusion, we find it important that unlike in *Yang*, Dr. Tran presented no evidence he made the statements because he wanted the message to be communicated to patients or future patients, or believed the message would be conveyed to the public. The California Supreme Court instructed that in analyzing section 425.16, subdivision (e)(4), courts should consider whether the statements "were private or widely broadcasted and

28

received, *and for what purpose.*" (*FilmOn.com*, *supra*, 7 Cal.5th at p. 146, italics added.) The high court illustrated this concept by discussing two frequently-cited Court of Appeal decisions holding that section 425.16, subdivision (e)(4) can "apply 'to private communications concerning issues of public interest.' " (*Id.* at p. 146; see *Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534 (*Terry*); *Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450 (*Hecimovich*).)

The *FilmOn.com* court said: "[C]ontextual factors mattered in both *Terry* and *Hecimovich*. In *Terry,* the court considered that the speakers were church leaders attempting to protect children in the church's youth groups, *as evidenced by the fact that 'the matter was referred to the Davis Police Department for investigation.'* [Citation.] In *Hecimovich,* too, the court highlighted the relationship between the speech, the speaker, and the audience [by] . . . emphasizing that [the] 'communications . . . concern[ed] the well-being of young children in an afterschool sports program, *as discussed between and among members of the [parent-teacher organization], parents of the young team members, and league officials.'* " (*FilmOn.com, supra,* 7 Cal.5th at p. 146, italics added.)

In this case, unlike in *Terry* and *Hecimovich*, Dr. Tran produced no information (including in his declaration) that his email to Dr. Burgess was part of his activities seeking to raise the issue of Dr. Murray's competence in the public sphere. Unlike *Terry*, there was no information that Dr. Tran had referred the matter to a public agency for investigation. Dr. Tran's assertions in his supplemental brief that Dr. Murray had alleged he had communicated his concerns to the Dental Board are not supported by the record. Further, his reference to the California Dental Board in this email to Dr. Burgess, reflected at most a possible future course of action if the matter could not be

29

resolved internally, and not a current public discussion or conversation on the topic. And unlike in *Hecimovich*, there was no evidence his statements to Dr. Burgess about Dr. Murray's alleged malpractice were being discussed or intended to be discussed with the interested parties, i.e., the current or prospective patients.

### 2.d. *Fourth Category of Alleged Defamatory Statements*

Dr. Murray alleged that in December 2017, Tran telephoned another dentist (Dr. Roger Tran), who was the owner of a practice at which Murray was working after Tran expelled Murray from TMDC. Dr. Tran first texted Dr. Roger Tran to say he had " 'something alarming' " to tell him. During their ensuing phone call, Dr. Tran allegedly told Dr. Roger Tran the following:

> " '[Dr. Tran was] looking through his charts of patients at his office in La Jolla [and] found bad work happening at his practice. He [was] implying that he had evidence that Dr. Murray is doing substandard care in La Jolla. He also stated that he is sending evidence to the Board to substantiate his claim. I asked him exactly what substandard care did he see that Dr. Ian Murray did. [Dr.] Tran stated that he cannot tell me. He stated the reason he is telling me because he likes me and that he wants to protect his patients and my patients from Dr. Murray's (alleged) substandard care.' "

Neither party submitted any additional information regarding this communication or the context in which it was made.

We conclude Dr. Tran met his burden to show the alleged statements to Dr. Murray's current employer furthered the public discourse that made the issue one of public interest. Dr. Tran specifically told Dr. Roger Tran that he wanted to warn him about problems with Dr. Murray's work because he wanted to "protect" Dr. Roger Tran's patients from "substandard care." These statements—made to a current employer—were directly tethered to

the issue of public interest (a dentist's competence to perform dental work) and promoted the public conversation on that issue because they were made to a person who had direct connection to and authority over the patient population with whom Dr. Murray was working at the time. (See *Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644, 1653 [information provided by an employment screening service to a prospective employer constituted protected activity under the anti-SLAPP statute because of the strong public interest in "safe workplaces, and in the liability which may attach to employers who fail to investigate prospective employees . . . ."]; see also *FilmOn.com, supra,* 7 Cal.5th at p. 145 [citing *Mendoza* with approval in discussing that courts must consider "contextual cues" in evaluating whether statements contributed to the public discussion on a particular topic].)

### 2.e. *Fifth Category of Alleged Defamatory Statements*

In the fifth category, Dr. Murray alleged that "on or about October 1, 2017, [Dr. Tran] held a meeting with staff personnel at TMDC such that [he] . . . appeared by video or phone conference with staff personnel of TMDC, including doctors, the location manager, hygienists, dentists and others, during which [Dr.] Tran stated to these individuals that [Dr.] Murray engaged in substandard medical care of his patients or words or conduct to that effect." Neither party presented any other information concerning these alleged statements.

As in the first, second, and third categories, there is insufficient information in the record that these statements contributed to, or constituted participation in, a public discussion on the issue of Dr. Murray's qualifications and fitness to practice dentistry. As with those categories, there is no showing that the statements were made to any patient or anyone

31

outside of the TMDC dental practice.  Moreover, it is not reasonable to infer that Dr. Tran intended, or desired, that his claims about Dr. Murray providing substandard dental care to Bird Rock Dental patients would be communicated outside the office to the patient community, since Dr. Tran was a 50 percent owner of the business.  Instead, the only reasonable conclusion is that these statements were made solely for *private purposes*— e.g., to enhance the quality of dental care at TMDC *or* to provide an explanation for Dr. Tran's decision to separate from Dr. Murray *or* to embarrass and belittle Dr. Murray and thus pressure him to abandon his claims of financial improprieties against Dr. Tran.  The record does not support that Dr. Tran communicated or intended to communicate the statements made to the office staff to the broader public, medical/dental community, or to the patient population.

## II.  *Probability of Prevailing*

### A.  *Legal Principles*

If the moving party on an anti-SLAPP motion makes the required showing on any one claim, the burden shifts to the opposing party to demonstrate the merit of that claim.  (*Baral*, *supra*, 1 Cal.5th at p. 396.)  At this stage, we consider only the probability of prevailing on the allegations of protected activity.  (*Ibid.*)

To satisfy the probability of prevailing standard, "[t]he plaintiff need only state and substantiate a legally sufficient claim.  [Citation.]  The plaintiff's evidence is accepted as true; the defendant's evidence is evaluated to determine if it defeats the plaintiff's showing as a matter of law."  (*City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 420 (*Montebello*).)

Although the opposing party need only show "minimal merit" to satisfy the burden, (*Montebello, supra,* 1 Cal.5th at p. 420), the plaintiff cannot rely

on the allegations of the complaint, but must produce evidence that would be admissible at trial (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212; *Roberts v. Los Angeles County Bar Assn.* (2003) 105 Cal.App.4th 604, 613-614; *ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1010).

## B. *Analysis*

The sole claim alleging protected activity under the anti-SLAPP statute was Dr. Murray's allegation that Dr. Tran committed defamation when he made false statements in December 2017 to Dr. Murray's then-current employer, Dr. Roger Tran. Thus, the burden shifted to Dr. Murray to establish a probability he can prevail on *this* defamation claim.

The elements of a defamation claim are (1) publication of fact that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage. (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720; *J-M Manufacturing Co., Inc. v. Phillips & Cohen LLP* (2016) 247 Cal.App.4th 87, 97.)

Dr. Murray contends he met his burden on each of these elements. We do not reach these arguments because Dr. Murray did not present evidence of a foundational fact on the very first element—that Dr. Tran in fact made these statements. Although Dr. Murray *alleged* in his complaint the content of the conversation between Dr. Tran and Dr. Roger Tran, he did not present any *evidence*—admissible or inadmissible—that this conversation in fact occurred. For example, he did not present a declaration or deposition testimony from Dr. Roger Tran stating the nature of this conversation. Nor did he state in his declaration the basis of his alleged knowledge of this conversation, or seek a continuance to obtain this information. On this

33

record, Dr. Murray did not meet his burden to show he will prevail on this claim.[7]

### III. *Motion for Continuance*

A court may grant a continuance of an anti-SLAPP motion to allow discovery for good cause. (§ 425.16, subd. (g).) To establish good cause, the plaintiff must file a noticed motion identifying the specific discovery sought and showing this discovery is " 'needed . . . to establish a prima facie case' " and " 'tailored to that end.' " (*Abir Cohen Treyzon Salo, LLP v. Lahiji* (2019) 40 Cal.App.5th 882, 891.)

Dr. Murray requested a continuance in his written response to the anti-SLAPP motion. He submitted his counsel's supporting declaration. His counsel said she had been unable to schedule Dr. Tran's deposition because he had been unwilling to come to San Diego and was not being reasonable in providing available dates for a Las Vegas deposition. She also said that Dr. Murray has a pending motion to compel documents from an accountant.

The court did not expressly rule on this request, but implicitly denied it when it granted Dr. Tran's anti-SLAPP motion without permitting a continuance.

Dr. Murray contends the court abused its discretion. We need not reach this contention because the court's ruling was not prejudicial. We have concluded the court erred in granting Dr. Tran's anti-SLAPP motion except on Dr. Murray's claim involving Dr. Tran's alleged defamatory statements to Dr. Roger Tran. We found Dr. Murray did not present any facts showing that Dr. Tran in fact made these statements. In seeking a continuance, Dr.

---

[7] We note that this conclusion means only that Dr. Murray cannot recover damages based on Dr. Tran's alleged statements to Dr. Roger Tran, but it does not preclude Dr. Murray from submitting evidence about this alleged conversation to support other claims in the case.

Murray did not state or suggest that he needed to take Dr. Tran's deposition to obtain facts to support this claim, nor did Dr. Murray ask for additional time to obtain discovery from Dr. Roger Tran. On this record, any error in denying the continuance motion was harmless.

In the proceedings below, Dr. Murray made a separate motion for additional time to conduct discovery beyond the discovery cutoff date based on the anti-SLAPP discovery stay and other circumstances. Dr. Murray may reassert this motion in the trial court proceedings after remand.

## DISPOSITION

The anti-SLAPP order is reversed. The court shall vacate the order, and enter a new order (1) granting Dr. Tran's motion on the defamation claims set forth in Paragraphs 319 and 335 of Dr. Murray's second amended complaint; (2) striking Paragraphs 319 and 335 from the complaint; and (3) denying Dr. Tran's motion in all other respects. Appellants are entitled to costs on appeal.

HALLER, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.

35